OPINION *Page 2 
{¶ 1} The defendant-appellant, Robert Hollis, appeals the judgment of the Upper Sandusky Municipal Court convicting him of unlawful restraint following jury trial. On appeal, Hollis contends there was insufficient evidence to support the jury's finding of guilt; that the verdict was against the manifest weight of the evidence; that the trial court erred by allowing the state of Ohio to amend the bill of particulars following closing arguments; that the trial court's jury instruction on the element of privilege was in error; and that juror misconduct affected the outcome of his trial. For the reasons set forth herein, we affirm the judgment of the trial court.
 {¶ 2} On January 29, 2008, a complaint was filed against Hollis charging him with one count of unlawful restraint, a violation of R.C. 2905.03(A), a misdemeanor of the third degree. On February 15, 2008, the state filed a bill of particulars in response to Hollis' discovery request. Following a two-day jury trial, the court filed its final jury instructions and the jury's verdict finding Hollis guilty of unlawful restraint. On March 11, 2008, the court journalized the jury's verdict and ordered a pre-sentence investigation report to be prepared. On March 20, 2008, Hollis filed a motion for new trial based on alleged juror misconduct. Hollis attached one juror's handwritten affidavit in support of his motion. The state responded, asking the trial court to strike the affidavit of the juror. On May 14, 2008, the trial court imposed a 30-day jail term; however, the sentence was *Page 3 
suspended pending Hollis' successful completion of two years on community-control sanctions. Hollis filed a notice of appeal on May 15, 2008, and the trial court overruled his motion for new trial on May 19, 2008. Hollis appeals the May 14, 2008 judgment entry of conviction and sentence, raising five assignments of error for our review.
 Assignment of Error No. 1 The record contains insufficient evidence to support Defendant-Appellant's conviction for unlawful restraint.
 Assignment of Error No. 2 Defendant-Appellant's conviction for unlawful restraint is contrary to the manifest weight of the evidence.
 Assignment of Error No. 3 The trial court erred in instructing the jury that the chief had no privilege as a matter of law.
 Assignment of Error No. 4 The trial court erred to the prejudice of Defendant-Appellant by allowing amendment of the bill of particulars at the close of evidence and instructing the jury that was [sic] guilty of unlawful restraint if he told Mr. Silva not to come back to Upper Sandusky.
 Assignment of Error No. 5 Defendant-Appellant's trial was rendered fundamentally unfair by juror misconduct and an irregularity in the proceedings. *Page 4 
 Assignment of Error No. 6 The combination of the aforementioned errors are sufficient to call into question the validity of the verdict, preventing the Appellant from obtaining the fair trial guaranteed by the Fifth and Sixth Amendments to the U.S. Constitution as made applicable to the states by the Fourteenth Amendment, and Article One, Sections Ten and Sixteen of the Ohio Constitution.
 {¶ 3} In the first assignment of error, Hollis contends the conviction was not supported by sufficient evidence. Sufficiency of the evidence is a test of adequacy, used to "`determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541, quoting Black's Law Dictionary (6 Ed. 1990) 1433; citing Crim. R. 29(A); State v. Robinson (1955), 162 Ohio St. 486,124 N.E.2d 148. A conviction based on insufficient evidence constitutes a denial of due process, and the defendant may not be recharged for the offense. Thompkins, at 386-387, citing Tibbs v. Florida (1982),457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652, citing Jackson v. Virginia
(1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 4} In reviewing a claim under the sufficiency of the evidence standard, an appellate court must determine "`whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. Bridge, 3d Dist. No. 1-06-30, 2007-Ohio-1764, quoting State v. Jenks (1991), *Page 5 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in State v. Smith (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.
 {¶ 5} Hollis was convicted of unlawful restraint, a violation of R.C. 2905.03(A), which states, "[n]o person, without privilege to do so, shall knowingly restrain another of the other person's liberty." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).
 {¶ 6} On the evening of October 14-15, 2007, Jesus Silva spent the night with his minor girlfriend, Brittany. Brittany's grandmother, as her legal custodian, was unaware that Silva spent the night, as was Brittany's mother. However, both women had objections to Brittany's association with Silva. On the morning of October 15, 2007, Brittany drove Silva to the high school in her grandmother's car with the intention of taking him to his residence in Marion, Ohio at the end of the school day. *Page 6 
 {¶ 7} A school official, who was patrolling the parking lot, noticed Silva sleeping in the car. The official notified an assistant principal, and both men woke Silva and questioned him after conducting a pat-down search. In the meantime, the school's secretary had called the police department concerning Silva's presence at the school. Tyler Howell, a patrolman with the Upper Sandusky Police Department, was the first officer to respond to the high school and began to question Silva. While Howell was talking with Silva, Dean Derr, another officer from the Upper Sandusky Police Department, arrived and spoke with the vice-principal, the other official, and Brittany's grandmother, who had also arrived in the parking lot.
 {¶ 8} Silva explained to Howell that he was waiting for Brittany to get out of school so she could drive him to Marion. Brittany was located in the school and verified Silva's story. Howell told Silva he could not remain in the school's parking lot, and Silva was prepared to wait at the public library. However, Hollis, the chief of police, arrived and immediately put Silva in an arm restraint and bent him over the hood of a squad car to conduct a pat-down search. Hollis questioned Silva about a visible tattoo on his left hand, and looked at the other tattoos on Silva's person. Eventually, Silva was handcuffed and taken to the police station by Howell. The testimony was disputed as to whether Silva was under arrest at the time of his transport to the police station. *Page 7 
 {¶ 9} The following facts are pertinent to the issues raised on appeal, thus requiring a more extensive recitation. The first witness to testify for the state was Silva, who stated that Howell took photographs of his tattoos at the police station. (Trial Tr., Jun. 23, 2008, at Vol. I, 101). When Hollis came into the interview room, he called Silva "retarded and stupid," and Silva was scared. (Id. at 101-102). Hollis asked Silva how he was going to get home, and Silva stated that he would have to walk. (Id. at 102). Hollis told Silva he would be taken to the county line between Wyandot and Marion Counties, and Derr transported him there. (Id. at 102-103). Silva testified that he had not returned to Upper Sandusky until the trial. (Id. at 105). On cross-examination, Silva admitted that he lied to Howell and Hollis about the meaning of his tattoos, which actually signified his membership in the Latin Kings gang. (Id. at 117). Silva did not know how long Hollis detained him but stated that he felt Hollis had not helped him get to Marion. (Id. at 128). Silva told the jury he was forced to ride to the county line. (Id. at 129; 132). On re-direct, Silva testified he had told Howell he would walk to the public library to wait for Brittany to get out of school so she could drive him to Marion. (Id. at 133-134). In response to the court's questions, Silva testified that nobody asked if they could take him to the county line, and he denied objecting to being taken to the county line. (Id. at 134-135).
 {¶ 10} Jerome Kiser was assigned as the prosecutor's investigator in this case. Kiser testified that he interviewed Hollis during his investigation. Hollis *Page 8 
apparently objected to Silva's "`slouching crap,'" which he believed evidenced "an attitude toward [Hollis] and everybody, like you're-fucking-with-me attitude." (Id. at 193). Hollis told Kiser that an officer transported Silva to the county line on US Route 23. (Id. at 194). When Kiser asked, "`well, what if he didn't go,'" Hollis responded that Silva "had no choice. He was going to be transported to the Marion County line and out of Upper [Sandusky]." (Id. at 194).
 {¶ 11} Derr testified that he could overhear the interview between Silva and Hollis at the police station. (Id. at 214). Howell asked Silva if he could call somebody for a ride to Marion, and Hollis interrupted and said an officer would take him to the county line. (Id.). Derr testified that he drove Silva to the county line because "[t]hat's what chief told us to do." (Id. at 215). Had Silva objected to the ride, Derr "would have probably called Chief out, since he's the one that told me to take him to county line." (Id. at 216). Derr also stated that if Silva had asked him to stop and let him out, he would not have done so. (Id. at 217). On cross-examination, Derr repeatedly testified that Silva never refused the ride and never gave the impression that he did not want a ride. (Id. at 218-219).
 {¶ 12} Howell testified that he did not see Silva engage in any criminal activity to justify an arrest. However, Hollis told him to arrest Silva, and Howell read Miranda warnings to Silva. (Id. at 241-242; 245). At the police station, Hollis questioned Silva about his gang affiliation and why he had been at the high school, eventually telling Silva that an officer would drive him to the county line. *Page 9 
(Id. at 247-249). During Howell's testimony, Joint Exhibit 1, a DVD, was played for the jury. The video showed the following conversation:
 Howell: How can you get out of Upper?
 Silva: How can I? I'm gonna have to walk.
 Howell: Basically what its gonna come down to if you can't get a ride, you'll have to walk.
 Hollis: (entering the room) You goin' down the county line, you're gettin' outta the car at the county line. You can walk to Marion, okay? That sound good to you?
 Silva: Well . . .
 Hollis: Well, what?
 Silva: I didn't know I couldn't stay at the school like that.
 * * * (Hollis' remarks about Silva being stupid).
 Hollis: Take this mope down to county line and let him go. He can walk down to Marion as far as I'm concerned.
 * * *
 Hollis: Make sure he gets there safely.
(Trial Tr., at Joint Exhibit 1).
 {¶ 13} Construing the evidence presented in the state's case-in-chief in favor of the prosecution, we hold that any rational trier of fact could have found the essential elements of the offense of unlawful restraint proven beyond a reasonable doubt. Though we are aware of no statute or case law that creates a privilege for law enforcement to transport citizens to the borders of the jurisdiction, a privilege could arise based on the facts of a given situation. However, the facts of this case do not warrant such a finding. Although Silva indicated that he would have to walk, he never indicated that he wanted to walk. There is evidence from which a jury could find that Hollis knowingly restrained Silva's liberty, without privilege to do so, when he ordered that Silva be driven to *Page 10 
the border of Wyandot and Marion Counties. The first assignment of error is overruled.
 {¶ 14} In the second assignment of error, Hollis contends his conviction was not supported by the manifest weight of the evidence. Unlike sufficiency of the evidence, a challenge based on the manifest weight of the evidence requires the court to sit "as a `thirteenth juror.'" Thompkins, 78 Ohio St.3d at 387, quoting Tibbs, 457 U.S. at 42.
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."
(Emphasis added.). Id. at 387, quoting Black's Law Dictionary (6 Ed. 1990), at 1594. When an appellant challenges a conviction based on the weight of the evidence, the court must review the entire record, weigh the evidence and "all reasonable inferences," consider witness credibility, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. To reverse a conviction based on the manifest weight of the evidence, a unanimous panel of three *Page 11 
appellate judges must concur. State v. Michaels, 3d Dist. No. 13-99-41, 1999-Ohio-958, citing Thompkins, at 389.
 {¶ 15} The evidence adduced by the state has been set forth above. In his defense, Hollis introduced testimony from Brittany's grandmother, who told the jury she was upset with Brittany for continuing her relationship with Silva. (Trial Tr., at Vol. I, 295-297). Tara Shandall, Brittany's mother, testified about how Silva had come to live with her for a period of time and why she had subsequently thrown him out of the apartment. (Id. at 301-303). Robert Nasmulski [spelling per transcript], a deputy with the Allen County Sheriffs Office, testified about his knowledge of certain gang issues. (Id. at Vol. II, 52-73).
 {¶ 16} Mark Pierce, a sergeant with the Allen County Sheriff's Office, testified that he investigates use of force issues. Pierce testified that the Allen County Sheriff's deputies transport individuals to the Allen County borders "on a fair amount of basis." (Id. at 26). Pierce spoke specifically about hitchhikers along some of the interstate highways that intersect Allen County. (Id.). On cross-examination, Pierce testified that the Allen County Sheriffs Office does not have a written policy concerning the transportation of people to the county's borders, and he had last transported somebody "a number of years" ago. (Id. at 38-39). Pierce stated that the deputies transport people who desire a ride and people who have been ordered by a judge to stay out of Allen County; however, the deputies do not force anybody else to leave the county. (Id. at 40-41). *Page 12 
 {¶ 17} Finally, Hollis testified on his own behalf as follows:
 Q: Why did that conversation — or why did you be less than polite with him?
 A: Because I went in there and I asked him, I said, "Okay, where do you want to go?" He goes, "Back out to the high school." You know, "You can't go back out to the high school," you know. And then he finally said, "Take me to Marion." And I said, "We can't take you to Marion. We can take you to the County line, but we can't take you all the way into the Marion."
(Id. at 99-100). If Hollis had the opportunity to go back and change anything, he would still transport Silva to the county line, but he maybe would have transported him all the way to Marion. (Id. at 101). On cross-examination, Hollis indicated that Silva was not free to simply walk home, and he stated, "[w]e offered him a ride and he accepted." (Id. at 119). Hollis also repeatedly testified that Silva wanted a ride to Marion, and he simply had an officer take him part way to his destination. (Id. at 119).
 {¶ 18} The jury had all of the above evidence before it during deliberations. On the issue of privilege, the jury was to determine whether Silva had requested or consented to the ride to the county line, as either situation would have given Hollis the privilege to have Silva transported to the county line. The jury, being in the better position to hear the testimony and observe the demeanors of the witnesses, apparently disbelieved Hollis' version of events. Since we must defer to the finder of fact on issues of credibility, the second assignment of error is *Page 13 
overruled. See State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, at paragraph one of the syllabus.
 {¶ 19} In the third assignment of error, Hollis contends that the trial court erred when it instructed the jury that Hollis had no privilege as a matter of law. Hollis argues that privilege was a question of fact the jury was required to consider in order to convict him. In response, the state contends that Hollis failed to object to the court's instruction, and his argument fails under the plain error analysis.
 {¶ 20} As part of its instructions to the jury, the court stated:
 Now, for purposes of privilege, I instruct you there has been no evidence presented in this case that would show that the defendant has a lawfully-recognized privilege to either transport the defendant to the border of Wyandot, Marion County, or to prohibit the defendant from being in Upper Sandusky.
 Therefore, you are charged as a matter of law that the defendant does not have a privilege to transport the defendant to the county line border or to prohibit the defendant from being in Upper Sandusky.
 However, it is your duty still to determine from the evidence presented if the defendant caused the transportation of Silva either at Silva's request or with Silva's consent. You still need to look into that, and that's a factual determination you have to make.
 Without regard to that — I mean, without that consent, or without that request of Silva, there is no, is no, legal privilege for this officer to transport or order the transportation of that defendant.
(Trial Tr., at Vol II., 166-167). *Page 14 
 {¶ 21} Defense counsel did not object to the trial court's instruction concerning privilege and therefore, we must review the record for plain error. State v. Tibbetts (2001), 92 Ohio St.3d 146, 157, 749 N.E.2d 226, citing State v. Johnson (2000), 88 Ohio St.3d 95, 111, 723 N.E.2d 1054. Under Crim. R. 52(B), plain error does not exist unless the defect in the trial court was obvious and affected the defendant's substantial rights.State v. Chaney, 3d Dist. No. 13-07-30, 2008-Ohio-3507, at ¶ 39, citingState v. Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. "Plain error is to be used `with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" Id., quoting Barnes at 27. "Plain error exists only in the event that it can be said that `but for the error, the outcome of the trial would clearly have been otherwise.'" Id., quoting State v. Biros (1997),78 Ohio St.3d 426, 431, 678 N.E.2d 891; State v. Johnson, 3d Dist. No. 2-98-39, 1999-Ohio-825.
 {¶ 22} As the trial court noted, the state presented no evidence that Hollis had a legal privilege to have Silva transported to the county line. Hollis relies on this court's decision in State v. Norman (1999),136 Ohio App.3d 46, 735 N.E.2d 953, in which we held a search and seizure was reasonable under the Fourth Amendment of the United States Constitution because the officer came into contact with the defendant as part of his community caretaking functions. While we recognize that police officers are responsible for community caretaking functions, we cannot hold that Hollis was prejudiced by the court's instruction to *Page 15 
the jury. The court prohibited the jury from determining whether Hollis was authorized by a statute, regulation, or case law to have Silva transported because the state had presented no evidence of such a law. However, the court's instruction did not take away from the jury's consideration the entire element of privilege. The court asked the jury to determine whether Hollis was privileged to have Silva transported to the county line based on the specific facts of the case. This was a factual determination, it was left to the discretion of the jury, and it is not in conflict with the Norman decision nor any other decision of this court in which we have discussed police officers' community caretaking functions. The third assignment of error is overruled.
 {¶ 23} In the fourth assignment of error, Hollis contends the trial court erred by allowing the state to amend the bill of particulars after the jury had been instructed and had entered into deliberations. The original bill of particulars focused on Hollis' conduct in the high school's parking lot and the transportation of Silva to the county line. At trial, Hollis admitted that he told Silva not to come back to Upper Sandusky. (Trial Tr., at Vol. II, 110). In its instructions, the trial court told the jury to focus on the transportation and Hollis' statement restricting Silva from returning to Upper Sandusky. Defense counsel objected to the instruction, and a discussion was held between the court and counsel off the record. (Id. at 158). The court mentioned the objection but proceeded with its instruction. *Page 16 
 {¶ 24} After the jury went into deliberations, a matter came to the court's attention, and the jury was returned to the courtroom. At that time, the court gave a second set of instructions, which also mentioned Hollis' statement prohibiting Silva's return to Upper Sandusky. The jury was sent back to the jury room, and defense counsel again objected to the instruction, this time challenging the instruction based on the lack of information in the state's bill of particulars. (Id. at 186-192). The trial court permitted the state to amend the bill of particulars to include Hollis' statement before the jury returned with its verdict of guilty.
 {¶ 25} A trial court's decision allowing the amendment of a bill of particulars is reviewed for an abuse of discretion. State v.Gibson, 12th Dist. No. CA2007-08-187, 2008-Ohio-5932, at ¶ 16, citing State v. Perales, 5th Dist. No. 06-CA-A-12-0093, 2008-Ohio-58, at ¶ 140. An "`abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144
(citations omitted).
 {¶ 26} Crim. R. 7(E) provides:
 When the defendant makes a written request within twenty-one days after arraignment but not later than seven days before trial, or upon court order, the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charge and of the conduct of the defendant alleged to constitute the offense. A bill of particulars may be *Page 17 amended at any time subject to such conditions as justice requires.
R.C. 2941.30 also pertains to bills of particular and states:
 The court may at any time before, during, or after a trial amend the indictment, information, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If any amendment is made to the substance of the indictment or information or to cure a variance between the indictment or information and the proof, the accused is entitled to a discharge of the jury on his motion, if a jury has been impaneled, and to a reasonable continuance of the cause, unless it clearly appears from the whole proceedings that he has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that his rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury. In case a jury is discharged from further consideration of a case under this section, the accused was not in jeopardy. No action of the court in refusing a continuance or postponement under this section is reviewable except after motion to and refusal by the trial court to grant a new trial therefor, and no appeal based upon such action of the court shall be sustained, nor reversal had, unless from consideration of the whole proceedings, the reviewing court finds that the accused was prejudiced in his defense or that a failure of justice resulted.
(Emphasis added). The statute allows any amendment to the bill of particulars so long as the name or identity of the crime charged is not changed. In this case, neither the name or identity of the crime charged was charged. Hollis was charged with unlawful restraint, and his own testimony established the grounds for the amendment. Following amendment of the bill of particulars, a conviction *Page 18 
could have been had on either the issue of transportation or Hollis' comment that Silva not return to Upper Sandusky.
 {¶ 27} Based on our above analysis concerning the sufficiency of the evidence and the manifest weight of the evidence, the jury could have convicted Hollis based on his having Silva transported to the county line. As such, Hollis is unable to show how he was prejudiced by the trial court's judgment allowing the state to amend its bill of particulars. Furthermore, Hollis has not shown how his defense could have, or would have, changed had he known earlier that the bill of particulars would be amended to include his comment restricting Silva from returning to Upper Sandusky. Accordingly, even if the trial court did err by allowing the state to amend its bill of particulars, the error was non-prejudicial, and the fourth assignment of error is overruled.
 {¶ 28} In the fifth assignment of error, Hollis contends his trial was rendered fundamentally unfair by juror misconduct and the trial court's subsequent corrective instructions to the jury. In response, the state argues that the jury was rehabilitated and that the trial court's instruction was not prejudicial.
 {¶ 29} When the jury was in deliberations, the court's bailiff walked past the door of the jury room and overheard that somebody had researched an issue on the internet. The bailiff reported the comment to the court, and the jury foreperson was brought into the courtroom. The foreperson indicated that one of the members of the jury had looked for the definition of "restraint" on the *Page 19 
internet. The foreperson identified the juror to the court, and the court then brought the entire jury back to the courtroom. The court instructed the jurors "to disregard anything that anybody tells you what happened on the internet." (Trial Tr., at Vol. II, 182). The court went on to state:
 Now, here's where you are in this trial. As I instructed you earlier, it's really not this complicated, this trial at this point in time.
 It's your obligation to determine from the evidence presented in this courtroom over the last two days the following: Did the defendant, did the defendant, tell Jesus Silva that he cannot stay in Upper Sandusky, or words to that effect? Did he?
 That's up to you to decide from the evidence you heard. If you find that he did that knowingly — and I defined "knowingly" to you — and if you decide that that statement is a restraint of movement of Jesus Silva, then your verdict should be guilty.
 If you find that the defendant did not make that statement, your verdict should be not guilty. Or if you find from the evidence in this case that the defendant ordered Jesus to be transported to the county line, which I've instructed you he has no authority to do, if you find that to be the case, then your verdict is guilty, unless, unless, you determine that Jesus is the one who actually asked for the ride.
 Now, I hope that can — I don't know how much clearer I can make it. And, again, you are instructed not to let your hearts fly. You were told about that in the instruction. You're not to create your idea of what you think the law should be.
 You are to follow the law as I have given it to you. And, again, in considering whether or not unlawful restraint has occurred, you have to look at all of these elements that we talked about. And we have narrowed the issue for you. *Page 20 Everything that happened at the school, all you're to consider that about is whether you think somebody's testimony is inconsistent and therefore they're lying about something else. You're not to consider at all about the unlawful restrained charge anymore.
 The only thing that's to be considered about the unlawful restraint the ride or was someone told they can't come to Upper Sandusky or they have to get out of town, whichever it was. You'll have to recall the facts. That's your job.
 And is that, was that, if it was done knowingly, either one of those, or — not or — and, was there a restraint of the defendant's movement?
 Now, are we clear on that? I guess I'm always amazed that no matter what you say, people on juries sometimes want to investigate on their own or they want to sit back in a room and say, "Well, why didn't this come up?" Well, it didn't come up because the lawyers didn't think it was important.
 So, please, I'm asking you — I need to know, and I'm going to go down one at a time. I don't need to know who the juror was, but can you set aside anything you heard from that juror about what was found on the internet at this point in time and make a decision based on the instruction that was given to you earlier today and hopefully clarify it here earlier now?
 * * *
 All right. Now, again, don't lose sight of the elements of the crime. You have them in the jury room. They're in there. You were given instruction, look at what the elements of the crime are.
 And the only thing you're to consider that fits the situation are the allegations now from the facts of those two things we've talked about.
 All right? Thank you. *Page 21 
(Trial Tr., at Vol. II 182-186).
 {¶ 30} The Supreme Court of Ohio has stated:
 A new trial may be granted for the misconduct of the jury where the substantial rights of the defendant have been materially affected. R.C. 2945.79(B); Weis v. State (1872), 22 Ohio St. 486. See, also, Crim. R. 33(A); R.C. 2945.79(A). Conversations by a third person with a juror during the progress of a trial for the purpose of influencing the verdict may invalidate the verdict, but where there is nothing in the record to demonstrate that the decision might have been influenced by such conversation, the refusal of the trial court to grant a new trial will not be disturbed. State v. Higgins (1942), 70 Ohio App. 383, 41 N.E.2d 1022. * * * "It is a long-standing rule of this court that we will not reverse a judgment because of the misconduct of a juror unless prejudice to the complaining party is shown. Armleder v. Lieberman (1877), 33 Ohio St. 77." State v. Kehn (1977), 50 Ohio St.2d 11, 19, 361 N.E.2d 1330
State v. Hipkins (1982), 69 Ohio St.2d 80, 83, 430 N.E.2d 943. As inHipkins, the record does not contain any evidence that the jury was prejudiced by one juror's outside research of a definition. Id. Also, as in Hipkins, the jury was reprimanded by the court, albeit somewhat harshly, and was given further instruction as to the focus of the case. Although the trial court did not read its prior instructions verbatim, and although the trial court deviated from the model jury instructions, the court's recitation of law was similar to its prior instructions. Furthermore, the jury had a copy of the trial court's original instructions with it in the jury room for reference, which contained an instruction on the element of restraint. (Trial Tr., at 172-173). *Page 22 
 {¶ 31} Hollis filed in the trial court one of the juror's affidavits, which stated that the jury felt pressured to find Hollis guilty based on the trial court's reprimand following the disclosure of outside research by a juror. The juror indicated that he was leaning toward a not guilty verdict before the trial court's curative instruction, but afterward, he felt only one answer could be reached, which was guilty. The juror also expressed his dissatisfaction with the bailiff's ability to overhear the jury's deliberations.
 {¶ 32} Evid. R. 606(B) provides:
 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying will not be received for these purposes.
"A firmly established common-law rule flatly prohibits the admission of juror testimony to impeach a jury verdict." State v. Hessler (2000),90 Ohio St.3d 108, 123, 734 N.E.2d 1237, citing State v. Robb (2000),88 Ohio St.3d 59, 79, 723 N.E.2d 1019. "The purpose of the aliunde rule is to maintain the sanctity of the *Page 23 
jury room and the deliberations therein. State v. Rudge (1993),89 Ohio App.3d 429, 438-439, 624 N.E.2d 1069. The rule is designed to ensure the finality of jury verdicts and to protect jurors from being harassed by defeated parties. The rule requires a foundation from nonjuror sources." Id., at 124.
 {¶ 33} The juror's affidavit contains no extraneous prejudicial information. Furthermore, although the trial court did chastise the jurors, it did not threaten the jurors or indicate how it believed the jurors should vote. The court expressed its opinion that the final issues to be determined were simple and isolated those issues. The affidavit submitted by Hollis in support of his motion for new trial is improper and will not be considered. Thus, there is no showing of prejudice. Apparently, the trial court believed the jurors had been rehabilitated when they indicated their ability to disregard any outside research and to follow the court's instructions. On this record, we can find no prejudicial error to Hollis, and the fifth assignment of error is overruled.
 {¶ 34} In the sixth assignment of error, Hollis argues that cumulative errors deprived him of a fair trial. Having reviewed the record, we conclude Hollis received a fair trial. See State v. Jones (2000),90 Ohio St.3d 403, 422, 739 N.E.2d 300, citing State v. Lott (1990),51 Ohio St.3d 160, 166, 555 N.E.2d 293, quoting United States v.Hastings (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96
(litigants are entitled to a fair trial, not a perfect trial.). We are also mindful of the Supreme Court of Ohio's holding that errors do not "`become *Page 24 
prejudicial by sheer weight of numbers.'" State v. Were,118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 261, quoting State v.Hill (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068. The sixth assignment of error is overruled.
 {¶ 35} The judgment of the Upper Sandusky Municipal Court is affirmed.
Judgment Affirmed
 PRESTON, P.J. and SHAW, J., concur. *Page 1